UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

LARRY JENNERJOHN,

        Plaintiff,

   v.                                     Case No. 22-C-1000

CITY OF STURGEON BAY,

        Defendant.

---

## DECISION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

This action arises out of Defendant City of Sturgeon Bay's decision to terminate Plaintiff Larry Jennerjohn's employment after he called in sick and missed a mandatory training session. Jennerjohn asserts an interference claim under the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2614(a)(1), as well as interference and retaliation claims under the Families First Coronavirus Response Act (FFCRA), Pub. L. No. 116-127, 134 Stat. 178 (2020). The court has jurisdiction pursuant to 28 U.S.C. § 1331. The case is before the court on the City's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the following reasons, the City's motion for summary judgment will be granted and the case dismissed.

### BACKGROUND

The City of Sturgeon Bay is a municipality offering services in Door County, Wisconsin, that employs approximately 69 full-time employees. Jennerjohn worked full-time in the City's Municipal Services Department. Beginning in 2014, Bob Bordeau, the City's Municipal Services Director at the time, began documenting performance-related issues and complaints from other staff concerning Jennerjohn. In 2015, Jennerjohn entered into a Last Chance Agreement with the

City, under which reoccurrence of inappropriate conduct by Jennerjohn would be grounds for immediate termination.

On March 13, 2020, Joshua Van Lieshout, the City Administrator, issued a "COVID-19 Update" memorandum, instructing employees to promptly notify their supervisor if they would miss work because they or one of their family members fell into a CDC-identified high-risk category and would be advised not to come to work. At that time, James Barker, who had replaced Bordeau as Municipal Services Director, oversaw all Municipal Services staff, including Jennerjohn. Steve Wiegand was the Crew Supervisor for the City's Municipal Services Department, to whom Jennerjohn reported directly at all relevant times.

On August 27, 2020, Wiegand informed Jennerjohn that he was to attend an eight-hour trench-digging safety training session on August 31, 2020. Approximately 30 people were expected to be in attendance, including fire department employees. Jennerjohn expressed fear of attending a session with first responders, who would be in contact with people who had COVID-19. He asked to be excused from the training session because of his age (63), his anxiety, and his wife's asthma, which he believed put them at a greater risk of suffering complications from COVID-19. Additionally, Jennerjohn did not believe he would be able to stay in the room for very long because he would be required to wear a mask, which gave him a rash and made him anxious.

Jennerjohn informed Wiegand that he would call in sick to avoid the training if he could not be excused from it. After consulting with Barker, Wiegand informed Jennerjohn that he could not miss the training session, even if he had attended the same type of training before. Jennerjohn asked if he could be excused under the COVID-19 policy and, again stated that, if not, he would call in sick to avoid the meeting. Although employees could take sick leave if they or members of their household were high-risk, as defined by the CDC, Wiegand did not believe that Jennerjohn

2

was requesting leave as a result of his or his wife's risk of suffering complications from COVID-19. Wiegand told Jennerjohn that, according to Barker, calling in sick on the day of the training would result in being docked eight hours of pay.

Later that day, Barker met with Jennerjohn to discuss his concerns. Jennerjohn again requested to be excused from attending the training, which Barker denied. Jennerjohn explained that he did not like wearing a mask because it gave him a rash and caused him anxiety. He asked if he could participate in the training via computer or if the training could be held in the Fire Department Bay, and Barker denied those requests as well. Barker neither confirmed nor denied that Jennerjohn would be docked eight hours of pay for calling in sick on the day of the training. Jennerjohn became agitated and began to experience panic. He told Barker that his "management style sucks" and asked whether Van Lieshout was aware of Barker's decision not to excuse his attendance. Def.'s Proposed Findings of Fact (DPFOF) ¶ 24, Dkt. No. 22.

Barker then informed Van Lieshout that Jennerjohn planned on missing the training. Barker also called the Assistant Fire Chief, who said the training could not be outdoors because it required the use of a computer, but it could be moved to a larger room, to allow for social distancing. When he learned of this, Jennerjohn told Barker that he would attend the training and sit near the doorway so he could step outside and take breaks, as needed, if his mask began to bother him or he became anxious. Barker assured him that this would not be a problem.

Jennerjohn claims that, over the weekend, he began to experience anxiety in anticipation of the training, such that he was unable to sleep for more than two hours the night before it. On August 31, 2020, the morning of the training, Jennerjohn left a voicemail message on the Municipal Services Department answering machine, stating:

> This is Larry Jennerjohn. It is Monday, August 31st. Because of the impending indoor training, my wife and I have been experiencing some anxiety issues to the

3

extent of us not getting adequate sleep. Two hours of sleep last night along with a headache doesn't work for me. I will be out sick today. Thank you.

*Id.* ¶ 36.

Barker forwarded the voicemail to Van Lieshout and Stephanie Reinhardt, the City Clerk and Human Relations Director for the City, to discuss Jennerjohn's absence. They decided to give Jennerjohn an opportunity to obtain a doctor's note substantiating a medical need for leave while they reviewed his personnel file and Last Chance Agreement before determining how to proceed. Van Lieshout left a message on Jennerjohn's answering machine informing him he would need to provide a doctor's excuse to validate his need for sick leave on August 31, 2020. In light of Jennerjohn's previous statements about taking sick leave rather than attend the training session, the City officials believed that he had abused the sick leave policy.

In response to Van Lieshout's instruction, Jennerjohn went to the Door County Urgent Care clinic on September 1, 2020, and was seen by Dr. Sandra Martens. Dr. Martens generated a report that read:

> The patient has a remote history of migraines. Still gets some very occasionally, such as every other year. On Sunday he did have a lot of anxiety about meeting the next day in his office with not sufficient social distancing and did become stressed and anxious and slept very poorly which triggered a migraine in the morning. He stayed home in bed and missed message from his employer stating that he needed to have a doctor's excuse. He saw the message this morning. Does not have a migraine this morning, he feels back to normal. He did not have any vomiting. Did complain of generalized headache with photosensitivity.

*Id.* ¶ 55. Dr. Martens also provided Jennerjohn with a "Work Release," which stated he had been seen and discharged from Urgent Care on September 1, 2020, at 9:21 a.m., and had permission to return to work. Under "limitations," the note stated, "Excused 8/31/20. Released to work without restriction." *Id.* ¶ 56.

4

Van Lieshout was dissatisfied with the note because he did not think it explained why Jennerjohn was unable to attend the meeting on August 31, 2020, and gave Jennerjohn "one final chance to provide medical documentation substantiating [his] use of paid sick leave on August 31, 2020." *Id.* ¶ 60. Jennerjohn failed to provide any further documentation. On September 3, 2020, Jennerjohn was given the option to retire or resign, so that he would be eligible to receive payout of his sick leave and pension benefits, or face termination. On September 4, 2020, Jennerjohn submitted a written notice of retirement. He began receiving payments under his pension, as well as unemployment compensation, effective September 5, 2020.

## LEGAL STANDARD

Summary judgment is proper where there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A dispute is genuine if a reasonable trier of fact could find in favor of the nonmoving party. *Wollenburg v. Comtech Mfg. Co.*, 201 F.3d 973, 975 (7th Cir. 2000). A fact is material only if it might affect the outcome of the case under governing law. *Anweiler v. Am. Elec. Power Serv. Corp.*, 3 F.3d 986, 990 (7th Cir. 1993). In deciding a motion for summary judgment, the court must view the evidence and draw reasonable inferences in the light most favorable to the nonmoving party. *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018) (citing *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017)). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* Summary judgment is properly entered against a party "who fails to make a showing to establish the existence of an element essential to the party's case, and on which that

party will bear the burden of proof at trial." *Austin v. Walgreen Co.*, 885 F.3d 1085, 1087–88 (7th Cir. 2018) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## ANALYSIS

### A. Evidentiary Objections

Before reaching the substance of the parties' arguments, the court will address Jennerjohn's evidentiary objections to the City's Proposed Findings of Fact. The requirement that "evidentiary materials" be submitted to support or oppose a motion for summary judgment follows from the rule that "a court may consider only admissible evidence in assessing a motion for summary judgment." *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). Jennerjohn has objected to a number of the Proposed Findings of Fact submitted by the City on the ground that the evidence cited in support of the Proposed Finding is inadmissible hearsay. *See* Pl.'s Resp. to DPFOF ¶¶ 16, 33–34, 43, 45, & 67–71, Dkt. No. 24 (note: some of Jennerjohn's Responses are misnumbered). Half of those objections, those to the City's Proposed Findings of Fact paragraphs 16, 33, 34, 43, and 45, cite Jennerjohn's own testimony at a prior proceeding. That proceeding was a hearing before the Administrative Law Judge presiding over a complaint Jennerjohn filed with the Equal Rights Division (ERD) of the Wisconsin Department of Workforce Development alleging that the City violated the Wisconsin Fair Employment Law by discriminating against him based on the basis of his disabilities, which he listed as migraines and anxiety. Lehocky Aff., Dkt. Nos. 18, 18-1, & 18-4.

Jennerjohn's own testimony does not constitute hearsay under Federal Rule of Evidence 801(d)(2)(A) and is clearly admissible evidence. His objections to the City's Proposed Findings of Fact paragraphs 16, 33, 34, 43, and 45 are therefore overruled. The remaining objections are to Jennerjohn's ERD complaint and to the ERD's initial determination of no probable cause, which

6

are neither controlling nor relevant to the issues before the court here. Jennerjohn's objections to the City's Proposed Findings of Fact paragraphs 67, 68, 69, 70, and 71 are therefore sustained.

### B. FMLA Interference Claim

Jennerjohn has asserted an interference claim under the FMLA. "To prevail on an FMLA interference claim, [the employee] must establish that: (1) she was eligible for the FMLA, (2) her employer was covered by the FMLA, (3) she was entitled to leave under the FMLA, (4) she provided notice of her intent to take leave, and (5) her employer denied her FMLA benefits to which she was entitled." *Anderson v. Nations Lending Corp.*, 27 F.4th 1300, 1304 (7th Cir. 2022) (internal quotation marks and citation omitted). An employee is entitled to take leave under the FMLA when he suffers from "a serious health condition that makes [him] unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D).

The City argues that Jennerjohn was not entitled to FMLA leave because he was not suffering from any qualifying serious health condition. "Whether an illness or injury constitutes a "serious health condition" under the FMLA is a legal question that an employee may not sidestep in the context of summary judgment merely by alleging his condition to be so." *Haefling v. United Parcel Service, Inc.*, 169 F.3d 494, 499 (7th Cir. 1999). The FMLA defines a serious health condition to be "an illness, injury, impairment, or physical or mental condition that involves" either "inpatient care" or "continuing treatment by a health care provider." 29 U.S.C. § 2611(11). Under applicable regulations, "[i]npatient care means an overnight stay in a hospital, hospice, or residential medical care facility." 29 C.F.R. § 825.114. Jennerjohn offers no evidence that he spent the night at the hospital, or any other kind of medical care facility, due to his condition. Thus, he did not suffer a serious health condition involving inpatient care.

7

A serious health condition involving continuing treatment can consist of "[a] period of incapacity of more than three consecutive, full calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves" either:

> (1) Treatment two or more times, within 30 days of the first day of incapacity, unless extenuating circumstances exist, by a health care provider, by a nurse under direct supervision of a health care provider, or by a provider of health care services (e.g., physical therapist) under orders of, or on referral by, a health care provider; or
>
> (2) Treatment by a health care provider on at least one occasion, which results in a regimen of continuing treatment under the supervision of the health care provider.

29 C.F.R. § 825.115(a)(1), (2); *see also Haefling v. United Parcel Serv., Inc.*, 169 F.3d 494, 499 (7th Cir. 1999) ("It is hardly plausible that Congress intended to elevate minor illnesses lasting a day or two to the stuff of federal litigation."). Jennerjohn's complaints of a migraine headache and anxiety fall short of a serious health condition under 29 C.F.R. § 825.115(a) because he has offered no evidence that he was ever absent for three consecutive days for either condition. In fact, as of August 31, 2020, he had never received treatment for and, as of January 29, 2024, had never been diagnosed as having either anxiety or chronic migraines. DPFOF ¶¶ 42, 44.

"Serious health condition involving continuing treatment by a health care provider" can also include "chronic conditions." 29 C.F.R. § 825.115(c). A chronic serious health condition is one which:

> (1) Requires periodic visits (defined as at least twice a year) for treatment by a health care provider, or by a nurse under direct supervision of a health care provider;
>
> (2) Continues over an extended period of time (including recurring episodes of a single underlying condition); and
>
> (3) May cause episodic rather than a continuing period of incapacity (e.g., asthma, diabetes, epilepsy, etc.).

*Id.*

Again, however, Jennerjohn does not qualify under this section since it is undisputed that, as of August 31, 2020, he had never been treated for and, as of January 29, 2024, had never been diagnosed as having either chronic migraines or anxiety. DPFOF ¶¶ 42, 44. Moreover, Dr. Martens' September 1, 2020 report states "patient has a remote history of migraines. Still gets them very occasionally, such as every year or two." *Id.* ¶ 53. This is not enough to satisfy the requirement of periodic visits with a health care provider.

The remaining conditions that can qualify an employee as having a serious health condition (pregnancy, permanent or long-term conditions, conditions requiring multiple treatments) clearly do not apply. In sum, Jennerjohn did not suffer from a serious health condition that entitled him to FMLA leave on August 31, 2020. It thus follows that Jennerjohn cannot establish a prima facie FMLA interference claim, and there is no need to consider any issue of adequate notice or denial of FMLA benefits.

### C. FFCRA Interference Claim

Jennerjohn has also asserted an interference claim under the FFCRA. The FFCRA was in effect from April 2, 2020, to December 31, 2020. Generally, the FFCRA required employers to offer sick leave and emergency family leave to employees who were unable to work because of the pandemic. The FFCRA also incorporated the protections of the Employee Paid Sick Leave Act (EPSLA), Pub. L. No. 116-127, § 5101, 134 Stat. 178, 195 (2020). In particular, EPSLA required "covered employers to provide paid sick leave to employees with one of six qualifying COVID-19-related conditions." *Id.* It is under the EPSLA that Jennerjohn's FFCRA claims arise.

The court notes at the outset that it is doubtful that an interference claim is cognizable under EPSLA. Those courts that have considered the question have concluded that it is not. *See Tran v. Acme Machell Co., Inc.*, No. 21-CV-925-PP, 2022 WL 3369626, at *5 (E.D. Wis. Aug. 16, 2022)

9

("The language of the FFCRA does not support a claim for interference under the EPSLA. The EPSLA neither prohibits interference nor adopts or amends the FMLA. The plaintiff cannot state a claim for EPSLA interference."); *see also Connally v. United States Dep't of Veterans Affairs*, No. 22-10236, 2024 WL 1335183, at *11 (E.D. Mich. Mar. 28, 2024) (collecting cases). Even if an interference claim was cognizable, however, Jennerjohn's claim would still fail as the undisputed facts reveal he cannot prove a violation of the EPSLA.

The EPSLA provides: "An Employer shall provide to each of its Employees Paid Sick Leave to the extent that Employee is unable to work due to any of the following reasons":

> (1) The employee is subject to a Federal, State, or local quarantine or isolation order related to COVID–19.
>
> (2) The employee has been advised by a health care provider to self-quarantine due to concerns related to COVID–19.
>
> (3) The employee is experiencing symptoms of COVID–19 and seeking a medical diagnosis.
>
> (4) The employee is caring for an individual who is subject to an order as described in subparagraph (1) or has been advised as described in paragraph (2).
>
> (5) The employee is caring for a son or daughter of such employee if the school or place of care of the son or daughter has been closed, or the child care provider of such son or daughter is unavailable, due to COVID–19 precautions.
>
> (6) The employee is experiencing any other substantially similar condition specified by the Secretary of Health and Human Services in consultation with the Secretary of the Treasury and the Secretary of Labor.

29 C.F.R. § 826.20(a)(1); Pub. L. No. 116-127, § 5102(a).

Jennerjohn argues that, when he asked for paid sick leave, he was subject to Governor Evers' March 24, 2020, Emergency Order 12, a state quarantine or isolation order related to COVID-19. However, the quarantine order only remained in effect until April 24, 2020, months before Jennerjohn's absence. *See Wis. Legislature v. Palm*, 2020 WI 42, ¶ 6, 391 Wis. 2d 497,

942 N.W.2d 900. And because it did not require quarantine or isolation, the July 30, 2020, Executive Order #82, declaring a public health emergency and requiring face coverings in Wisconsin, was not a qualifying state order for EPSLA purposes. Likewise, the July 23, 2020, Door County Public Health Emergency Advisory Requiring Face Coverings, which Jennerjohn also cites, does not satisfy this condition. By his own admission, this local guideline merely "encouraged employees to isolate if they were sick, even with mild symptoms, including headaches." Pl.'s Br. in Opp'n at 17, Dkt. No. 23. This advisory guideline does not rise to an isolation order and does not entitle Jennerjohn to paid sick leave pursuant to EPSLA.

Jennerjohn also argues that, to the extent that he experienced a migraine, which is consistent with one of many COVID-19 symptoms, he was entitled to paid sick leave under subsection (3) of EPSLA. However, subsection (3) also required that employees experiencing such symptoms seek a medical diagnosis for COVID-19. Jennerjohn presents no evidence that he took a test or otherwise sought a medical diagnosis for COVID-19 while experiencing a migraine. Accordingly, he has not met this condition for EPSLA paid sick leave either and has thus failed to establish an FFCRA interference claim.

### D. FFCRA Retaliation Claim

The City argues that Jennerjohn's retaliation claim fails because his employment was not terminated for engaging in statutorily protected activity, but for insubordination. The FFCRA makes it "unlawful for any employer to discharge, discipline, or in any other manner discriminate against any employee who . . . takes leave in accordance with this Act." Pub. L. No. 116-127, § 5104. However, as explained above, Jennerjohn was not entitled to paid sick leave under EPSLA. Because Jennerjohn did not engage in statutorily protected activity, he has failed to establish a claim for retaliation.

## CONCLUSION

Although Jennerjohn suggests that the City's decision to terminate his employment may have also violated its own policies or practices, a violation of municipal policies or practices is not a claim asserted in the complaint, nor is it one over which this court has jurisdiction. Jennerjohn's complaint alleges violations of federal law, and for the reasons set forth above, the court concludes that he is unable to establish an essential element of those claims. The City's motion for summary judgment (Dkt. No. 15) is therefore **GRANTED** and the case is **DISMISSED**. The Clerk is directed to enter judgment forthwith.

**SO ORDERED** at Green Bay, Wisconsin this 9th day of April, 2024.

s/ William C. Griesbach
William C. Griesbach
United States District Judge